**Thomas M. WEILACHER and Melissa Weilacher, Husband and Wife, Appellants,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 30, 2012.
Filed April 25, 2013.

John W. McCandles, Erie, for Appellants.

Thomas A. McDonnell, Pittsburgh, for Appellee.

BEFORE: MUSMANNO, WECHT and COLVILLE *, JJ.

OPINION BY MUSMANNO, J.:

Thomas M. Weilacher and Melissa Weilacher ("Melissa"), Husband and Wife (collectively "the Weilachers"), appeal from the trial court's Order denying their Motion for summary judgment and granting State Farm Mutual Automobile Insurance Company's ("State Farm") Motion for summary judgment. We reverse and remand.

The trial court has set forth the stipulations of fact as agreed upon by the parties:

1. [The Weilachers] are the sole named insureds under a policy of automo-

* Retired Senior Judge assigned to the Superior Court.

bile insurance with [State Farm], which policy number is 005 0085–F27 ("the mutual policy").

2. The mutual policy was in full force and effect on April 26, 2010.

3. [The Weilachers] have submitted a claim for underinsured motorist ["UIM"] coverage under the mutual policy for damages they sustained as the result of injuries suffered by [Melissa] in an accident on April 26, 2010[,] with Gwen Steger in Waterford, Erie County, Pennsylvania.

4. [The Weilachers] have submitted documentation to [State Farm] that the automobile liability insurance carrier for Gwen Steger has offered and they have accepted its limits of bodily injury liability to [the Weilachers]. [State Farm] has waived its right of subrogation with regard to [Gwen] Steger.

5. [The Weilachers] have asserted that the limit of liability of [UIM] coverage under the mutual policy for their claim is $500,000, stacked for two vehicles.

6. [State Farm] has asserted that the limit of liability of [UIM] coverage under the mutual policy for [the Weilachers'] claim is $25,000 per person/$50,000 per accident, stacked for two vehicles.

7. . . . .

8. On June 27, 1994, [the Weilachers] made [an] application for an automobile policy with State Farm Fire and Casualty Company.

9. With that application, [the Weilachers] signed an "Important Notice," and a "Rejection of Underinsured Motorist Protection" form.

10. At the time of their application, [the Weilachers] (one or both of them) did not sign a written request selecting uninsured motorist ["UM"] coverage in an amount less than or equal to the bodily injury liability limits.

11. At the time of their application, [the Weilachers] (one or both of them) did not sign a written request selecting [UIM] coverage in an amount less than [or] equal to the bodily injury liability limits.

12. At the time of their application, State Farm Fire and Casualty Company had an "Acknowledgment of Selection" form by which a named insured could select [UIM] vehicle coverage limits in an amount less than or equal to the bodily injury liability limits, and required a named insured's signature.

13. At the time of their application, State Farm Fire and Casualty Company had an "Acknowledgment of Selection" form by which a named insured could select [UM] vehicle coverage limits in an amount less than or equal to the bodily injury liability limits, and required a named insured's signature.

14. At the time of their application, State Farm Fire and Casualty Company did not obtain an "Acknowledgment of Selection" form for either [UM] or [UIM] coverage signed by either of [the Weilachers].

15. State Farm Fire and Casualty Company issued a standard policy number S26 2204–F27 (the "standard policy") on June 27, 1994[,] to [the Weilachers].

16. The standard policy remained in effect until September 2, 1999.

17. During the period from June 27, 1994[,] to September 2, 1999, State Farm Fire and Casualty Company did not receive any requests to add

[UM] or [UIM] coverage in any amount.

18. During the period from June 27, 1994[,] to September 2, 1999[,] State Farm Fire and Casualty Company did not receive any signed written request from [the Weilachers] (one or both of them) selecting [UM] coverage in an amount less than or equal to the bodily injury liability insurance amount.

19. During the period from June 27, 1994[,] to September 2, 1999, State Farm Fire and Casualty Company did not receive any signed written request from [the Weilachers] (one or both of them) selecting [UIM] coverage in an amount less than or equal to the bodily injury liability insurance amount.

20. On September 2, 1999, the mutual policy was "issued" by [State Farm] as documented in the "Echo Policy Transactions" form. The form makes reference to "state forms" being sent. On that date, [the Weilachers'] insurance coverage was transferred from the standard policy written by State Farm Fire and Casualty Company, to the mutual policy written by [State Farm]. The mutual policy was a new policy replacing the standard policy. [The Weilachers'] insurance coverage was thereby transferred from State Farm Fire and Casualty Company to [State Farm].

21. On August 18, 1999, [Melissa] signed an "Important Notice." She also signed an "Acknowledgment of Coverage Selection for Pennsylvania Uninsured Motorist Coverage" selecting [UM] coverage with limits of $25,000/$50,000. Said documents reference the transfer of coverage to the new mutual policy and the selected [UM] coverage was applied to the new policy. A premium was charged for the selected [UM] coverage.

22. The mutual [policy] premium was lower than the standard policy premium.

23. The mutual policy was issued for coverage commencing June 27, 1999.

24. From the time the mutual policy was issued through the date of the accident, [State Farm] did not ever receive any document signed by [the Weilachers] (either one or both of them) rejecting [UIM] coverage in the form established by 75 Pa. C.S.A. section 1731(c.1) for the mutual policy.

25. Prior to the accident, [State Farm] did not ever receive any "Acknowledgment of Coverage Selection for Pennsylvania Underinsured Motorist Coverage" signed by [the Weilachers] (one or both of them), for the mutual policy.

26. From the time the mutual policy was issued through the date of the accident, [State Farm] did not ever receive any signed, written request from [the Weilachers] (one or both of them) selecting [UIM] coverage in an amount less than or equal to the bodily injury liability limits, for the mutual policy.

27. On February 17, 2000, an "Echo Policy Transactions" form completed by [a] State Farm agent[,] indicates that [UIM] coverage was "Add[ed]" to the mutual policy, with limits of coverage of $25,000/$50,000. This was equal to the existing bodily injury liability coverage of $25,000/$50,000.

a) [State Farm] did not receive any "Acknowledgment of Coverage for Pennsylvania Underinsured Motorist Coverage" signed by [the Weilachers] (one or both of them), relating to that "transaction."

b) [State Farm] did not receive any signed, written request from [the Weilachers] (one or both of them) selecting [UIM] coverage in that amount and relating to that "transaction." The amount of [UIM] coverage added to the mutual policy was the amount of the bodily injury liability coverage on the policy at that time.

c) The addition of the [UIM] coverage increased [the Weilachers'] premium.

28. On February 22, 2001, [Melissa] signed an "Important Notice."

29. On February 26, 2002, [Melissa] signed a "full tort" option election form. The change to the "full tort" option increased [the Weilachers'] premium.

30. On January 23, 2009, [the Weilachers] increased their bodily injury liability limits from $25,000/$50,000 to $500,000 single limit, and their property damage liability limit from $25,000 to $500,000. This is documented in an "Echo Policy Transactions" [form completed] by the State Farm agent. The increase in the bodily injury and property damage liability limits increased [the Weilachers'] premium.

a) During the period from January 23, 2009[,] through the date of the accident, [State Farm] did not receive an "Acknowledgment of Coverage Selection for Pennsylvania Underinsured Motorist Coverage" signed by [the Weilachers] (one or both of them), selecting the $25,000/$50,000 [UIM] coverage limit[.]

b) During the period from January 23, 2009[,] through the date of the accident, [State Farm] did not receive any signed, written request from [the Weilachers] (one or both of them), selecting [UIM] coverage of $25,000/$50,000[.]

Trial Court Opinion, 4/12/12, at 2–5.

The trial court set forth the relevant procedural history:

This matter was initiated by Complaint, filed on September 27, 2010. This matter was removed to the federal system by motion of [State Farm] in October of that same year. By Order of Court dated November 16, 2010, this matter was remanded back to the Court of Common Pleas of Allegheny County. . . . [State Farm] filed an Answer and New Matter on November 22, 2010. [The Weilachers] responded to said New Matter by reply on December 7, 2010.

[The Weilachers] filed a Motion for Summary Judgment on October 25, 2011. The parties filed their briefs in support/opposition sometime shortly thereafter. An argument on said [M]otions was scheduled by Order . . . .

After hearing/argument on the parties' respective Motions for Summary Judgment, [the trial court] issued an Order dated January 6, 2012, granting the Summary Judgment Motion presented by [State Farm] and denying [the Weilachers'] Motion for Summary Judgment, and further ordering that the [UIM c]overage for [the Weilachers] for the loss in question was deemed to be in the amount of $25,000 per person and $50,000 per accident. [The trial court, relying upon *Blood v. Old Guard Ins. Co.* [594 Pa. 151], 934 A.2d 1218 (Pa. 2007), found that there was no specific language under 75 Pa.C.S.A. §§ 1731,

1734 that required an insured to complete a written request for lower limits for UM/UIM coverage when the limits for bodily injury are increased. The Weilachers] appealed said Order on January 19, 2012.

Pursuant to Pa.R.A.P. 1925(b), [the trial c]ourt directed [the Weilachers] to file a Concise Statement of Matters Complained of on Appeal within twenty (20) days.... Said matters were timely filed on or about January 30, 2012[.]

Trial Court Opinion, 4/12/12, at 6–7.

On appeal, the Weilachers raise the following questions for our review:

 A. Whether the line of cases involving the effect of a prior written selection of UM/UIM coverage is applicable to the case *sub judice* wherein the Weilachers had never submitted a written request[?]

 B. Whether State Farm was obligated to provide underinsured motorist coverage in the amount of the bodily injury liability coverage as mandated by the Legislature and the line of cases involving no prior written request[?]

 C. Whether the [trial court] could fashion a remedy when State Farm could not produce a written request signed by the Weilachers for an amount of underinsured motorist coverage less than the amount of their bodily injury coverage of $500,000[?]

Brief for Appellants at 5.

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court.... An appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo*.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Brandon v. Ryder Truck Rental, Inc.*, 34 A.3d 104, 107–08 (Pa.Super.2011).

We will first review the applicable statutory provisions. Pursuant to the Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S.A. §§ 1701–1799.7, motor vehicle liability insurance carriers are required to offer the named insured UM/UIM liability coverage. Specifically, section 1731 of the MVFRL provides, in pertinent part, as follows:

(a) **Mandatory offering.**—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). Purchase of uninsured motorist and un-

derinsured motorist coverages is optional.

\* \* \*

**(c) Underinsured motorist coverage.**— Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles. The named insured shall be informed that he may reject underinsured motorist coverage by signing the following written rejection form:

### REJECTION OF UNDERINSURED MOTORIST PROTECTION

By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

\* \* \* \* \* \*

Signature of First Named Insured

\* \* \* \* \* \*

Date

75 Pa.C.S.A. § 1731.

Regarding a request for lower UM/UIM limits, section 1734 provides that "[a] named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury." *Id.* § 1734.

■ Section 1731 represents "a simple statement whose plain meaning is ap-

parent from its language." *Blood,* 934 A.2d at 1226 (citation omitted). Section 1731 mandates that an insurance company issuing a policy in the Commonwealth of Pennsylvania must provide UM/UIM coverage equal to the bodily injury liability coverage, unless the insured validly rejects UM/UIM coverage or validly requests lower limits of coverage pursuant to section 1734. *Id.* Under section 1734,

> a named insured may lower her statutorily provided UIM coverage limits by requesting[,] in writing[,] of her insurer to do so. The insurance company's obligation to issue a policy with [UM/UIM] coverage in an amount equal to the policy's bodily injury liability coverage is not relieved unless it has received such a written request.

*Id.* (citation and emphasis omitted). Furthermore,

> [i]n order to effect a valid request for reduction pursuant to § 1734, the named insured's written request must (1) manifest the insured's desire to purchase uninsured and underinsured coverage in amounts equal to or less than the bodily injury limits; (2) be signed by the named insured; and (3) include an express designation of the amount of uninsured and underinsured coverage requested. Hence, to conform with § 1734, the written request must be signed by the insured and must contain an express designation of the amount of coverage requested, all manifesting the insured's desire to purchase coverage in amounts less than the bodily injury limits.

*Nationwide Mut. Ins. Co. v. Catalini,* 18 A.3d 1206, 1209 (Pa.Super.2011) (citations and quotation marks omitted).

■ Moreover, we note that where a section 1791 "Important Notice" is properly afforded, "[i]t shall be presumed that

the insured has been advised of the benefits and limits available ... and no other notice or rejection shall be required." 75 Pa.C.S.A. § 1791; *see generally Lewis v. Erie Ins. Exch.*, 568 Pa. 105, 793 A.2d 143, 153 (2002)(stating that "[s]ection 1791 of the MVFRL occupies a central role as it concerns the conveyance of information regarding, *inter alia*, ... the insured's option to purchase coverage carrying lower benefit limits."). However, this presumption is not determinative of whether "the insured actually selects coverage in writing in conformity with § 1734." *Erie Ins. Exchange v. Larrimore*, 987 A.2d 732, 738 (Pa.Super.2009).

For ease of disposition, we will address the Weilachers' claims together. The Weilachers contend that the trial court erred in relying upon the reasoning in *Blood* and granting State Farm's Motion for summary judgment because the Weilachers never submitted any written request for UIM coverage in any amount. Brief for Appellants at 11–12; *see also* Reply Brief for Appellants at 6–7 (arguing that State Farm's reliance on *Blood* is unavailing as they never made a written selection to lower the UM/UIM coverage). The Weilachers argue that while they initially rejected UIM coverage, State Farm was not forever relieved of its statutory requirement to obtain a writing seeking to lower the UM/UIM coverage limits from the insured because UM/UIM coverage had been issued after the initial rejection. Brief for Appellants at 11–12, 19; *see also* Reply Brief for Appellants at 7. The Weilachers specifically argue that section 1734 was triggered when State Farm unilaterally set the UIM coverage in 2000 at $25,000/$50,000 to match the bodily injury liability coverage. Brief for Appellants at 11–12; *see also* Reply Brief for Appellants at 6. The Weilachers assert that the fact that State Farm never received any written request from them seeking a lesser

level of UM/UIM coverage following the addition of the coverage demonstrates that the UM/UIM coverage should remain equal to the bodily injury liability coverage. Brief for Appellants at 12, 13; *see also id.* at 14–17 (wherein the Weilachers point to several cases demonstrating that the UM/UIM limits are equal to the bodily injury liability limits in cases where there was no prior written selection). The Weilachers claim that their payment of premiums does not operate as a waiver under section 1734 as they never specifically requested lower UM/UIM coverage. Brief for Appellants at 23. The Weilachers also argue that the trial court erred in finding that even if State Farm violated the MVFRL, a judicial remedy for the Weilachers does not exist. *Id.* at 19–20. The Weilachers assert that a remedy is available to them under sections 1731 and 1734, as they are seeking UIM coverage that is equal to the bodily injury liability coverage. *Id.* at 20–21.

Here, the trial court relied upon the reasoning in *Blood* to conclude that the MVFRL does not require an insured to complete a *new* written request for lower UM/UIM limits when changes, including the increase of bodily injury limits, have been made to pre-existing policies. Trial Court Opinion, 4/12/12, at 12. In *Blood*, the policy, issued by Old Guard Insurance Company ("Old Guard") in 1986, provided $500,000 liability coverage and $35,000 UM/UIM coverage with stacking for Blood's three vehicles. *Blood*, 934 A.2d at 1219. Further, Blood executed a proper written request for reduced UM/UIM coverage. *Id.* In 2000, Blood executed a "coverage selection form" indicating a desire to reduce his liability coverage from $500,000 to $300,000. *Id.* at 1220. The form also contained various options to change the UM/UIM coverage levels; however, Blood did not mark any box or otherwise indicate

that he wanted to alter his existing UM/UIM coverage. *Id.* Following a motor vehicle accident and Old Guard's payment of benefits equaling the UIM policy limit of $35,000 per vehicle, Blood sought a declaratory judgment, arguing that the UIM coverage limit was $300,000 per vehicle because Old Guard did not secure a new election when he decreased the coverage limits on his liability policy. *Id.* The trial court granted summary judgment in favor of Old Guard. *Id.* at 1221–22.

On appeal, an *en banc* panel of this Court drew upon *dicta* from our prior decision in *Smith v. Hartford Ins. Co.,* 849 A.2d 277 (Pa.Super.2004), a case addressing the **rejection** of UM/UIM coverage under section 1731(b) and (c), and construed Blood's failure to mark a lesser level of UM/UIM coverage on the coverage selection form against Old Guard. *See Blood v. Old Guard Ins. Co.,* 894 A.2d 795, 797–98 (Pa.Super.2006) (*en banc*). Accordingly, this Court reversed the trial court, and reformed the insurance limits to provide Blood $300,000 UM/UIM coverage per vehicle, the same as the liability coverage limit. *Id.* at 798. In her dissent, Judge Joan Orie Melvin posited that Blood's decision to change his policy limits in an existing policy did not require an additional election of reduced UM/UIM coverage:

> When an applicant initially purchases an auto insurance policy, it is presumed that UM/UIM coverage will equal bodily injury limits unless the applicant signs a form electing to reject UM/UIM coverage or requests in writing to purchase lower UM/UIM coverage. *See* 75 Pa. C.S.A. §§ 1731, 1734. However, after a rejection or reduction of UM/UIM coverage has been made, the MVFRL does not explicitly require a new UM/UIM sign down form each time a policyholder

changes the liability limits. *See* 75 Pa. C.S.A. §§ 1731, 1734, and 1791.

*Blood,* 894 A.2d at 799.

In reversing the decision of this Court, the Supreme Court of Pennsylvania adopted the dissent's reasoning, and concluded that section 1734 was plain and unambiguous. *Blood,* 934 A.2d at 1226. The Supreme Court held that Blood's initial application indicating reduced UM/UIM coverage, which had never been changed, satisfied section 1734's writing requirement and remained in effect after a reduction in bodily injury coverage. *Blood,* 934 A.2d at 1227. The Court further noted that Blood had failed to cite any proviso within the MVFRL that required Old Guard to execute a new election for reduced UIM limits under the facts of that case. *Id.*

Here, in 1994, the Weilachers had an automobile policy with State Farm Fire and Casualty Company that had bodily injury liability coverage in the amount of $25,000/$50,000. The Weilachers signed an "Important Notice," and also rejected UIM coverage in this initial policy. In August 1999, Melissa signed another "Important Notice" and expressly selected UM coverage with limits of $25,000/$50,000, which matched the bodily injury liability coverage. In September 1999, the Weilachers' policy was transferred from State Farm Fire and Casualty Company to State Farm. Thereafter, in February 2000, State Farm added UIM coverage with limits of coverage of $25,000/$50,000, which matched the bodily injury liability coverage, to the Weilachers' policy. The Weilachers did not select this coverage or receive any acknowledgment of this transaction; however, in February 2002, Melissa signed an "Important Notice." In January 2009, the Weilachers increased their bodily injury liability limit to $500,000. The Weilachers did not sign any acknowl-

edgement for UM/UIM coverage, did not request UM/UIM coverage limits of $25,000/$50,000, and did not request a reduction of the statutorily provided UIM limits.

Based upon these facts, we conclude that the trial court erred in applying the *Blood* reasoning to grant summary judgment in favor of State Farm.[1] In effect, the trial court concluded that State Farm did not have any obligation to obtain a written request for lower limits of UIM coverage under section 1734 due to the Weilachers' initial rejection of UM/UIM coverage in 1994 under section 1731. However, the trial court ignores the fact that "[a]lthough the General Assembly clearly designed both [s]ections 1731 and 1734 as relating to [UIM] coverage, it is just as plain that it directed each provision to a different form of election: [section 1731(c)] to outright waiver/rejection of coverage ... and [s]ection 1734 to selection of specific limits[.]" *Lewis*, 793 A.2d at 153. Moreover, the trial court does not account for the addition of UM/UIM coverage after the initial rejection of the coverage in this case.

In *Smith*, *supra*, this Court determined that an insured's initial valid rejection of UIM coverage obviated the need for a new rejection letter after the liability limits had been raised in the absence of a change of UIM coverage by the insured. *See Smith*, 849 A.2d at 279–81; *see also Blood*, 934 A.2d at 1223 (addressing the *Smith* holding and concluding that "initial rejection of all UM/UIM coverage survived the subsequent increase in liability coverage in the absence of an affirmative change made by the insured."). The *Smith* Court stated that once UM/UIM coverage had been purchased, "the insurer may supply lower limits only upon affirmative request by the insured." *Smith*, 849 A.2d at 281; *see also id.* (stating that "once an affirmative election is made, that election is presumed to be in effect throughout the lifetime of that policy."). "The requirement for a new request for lower limits is not based on the premise that a new policy has been issued, but is based upon the statutory presumption that UM/UIM coverage, when purchased, will be equal to the bodily injury limits." *Id.*

 Based upon the reasoning in *Smith* and the plain language of sections 1731 and 1734, if an insured purchases new UM/UIM coverage following an initial rejection of UM/UIM coverage, the insurer must provide UM/UIM coverage equal to the bodily injury liability coverage, unless the insured validly requests lower limits of coverage pursuant to section 1734. *See id.; see also Blood*, 934 A.2d at 1223. As noted above, after the Weilachers purchased UM coverage with limits of $25,000/$50,000 in 1999, State Farm unilaterally and voluntarily provided UIM coverage in the same amount to the Weilachers in 2000, ostensibly in compliance with section 1731. *See Smith*, 849 A.2d at 280 (stating that the purchase of an insurance policy is not a lifetime contract and that amounts of coverage change). Further, the Weilachers paid a higher premium after the addition of the UM/UIM coverage. Thus, because the Weilachers affirmatively added the UM/UIM coverage following their rejection of UM/UIM coverage, State Farm could only supply lower UM/UIM coverage if the Weilachers signed a section 1734 written request.[2] *See id.* at 281. Howev-

---

1. We note that the reasoning in *Orsag v. Farmers New Century Ins.*, 609 Pa. 388, 15 A.3d 896, 901 (2011), and *Lewis*, 793 A.2d at 144–45, is inapplicable to this case based upon our analysis of *Blood*.

2. State Farm argues, without citation to any authority, that there was no need for a written request electing lower UIM limits because the UIM coverage added in 2000 was already equal to the bodily injury limits. *See* Brief for Appellee at 11–12, 14–15; *see also* Pa.R.A.P.

er, at no time after the UM/UIM coverage was added to the policy, and the bodily injury limits were increased to $500,000, did the Weilachers provide any written request seeking to lower the UM/UIM coverage levels pursuant to section 1734.[3] Therefore, the reasoning of *Blood*, where there was a valid request for lower UM/UIM coverage limits pursuant to section 1734 that continued to be binding even after Blood decreased his liability limits, is not applicable to this case. Accordingly, because the Weilachers never signed a written request for lower UM/UIM coverage limits pursuant to section 1734, the UIM coverage limit must be equal to the bodily injury limit of $500,000. *See Larrimore*, 987 A.2d at 743.[4]

State Farm also argues that it should not be compelled to reform the applicable coverage where the Weilachers paid lower premiums for the stated UIM coverage even after the bodily injury limits were increased. Brief for Appellee at 15–

16. It is well-settled that "the insured's payment of [their] premiums for several years thereafter cannot operate as a waiver under Sections 1734 and 1791." *Larrimore*, 987 A.2d at 742 (citation omitted); *see also Emig*, 664 A.2d at 565 n. 1 (stating that the payment of premiums for lower UM/UIM coverages for a period of years was insignificant). Thus, State Farm's obligation to issue a policy with UM/UIM coverage equal to the bodily injury liability coverage was not relieved due to the payment of lower premiums. *See Larrimore*, 987 A.2d at 742 (stating that the receipt of payment of lower premiums and renewal notices does not constitute a written request for lower limits pursuant to section 1734).

Finally, the trial court found that even if State Farm had violated section 1734 of the MVFRL, a remedy for such a violation does not exist within the statutory language. *See* Trial Court Opinion, 4/12/12, at 13; *see also* Brief for Appellee at 16–17.

---

3. We note that the fact that Melissa signed a section 1791 "Important Notice" in 2002 does not "satisfy the written request for lower limits requirement of § 1734 as [s]ection 1791 does not provide a mechanism for requesting UM/UIM coverages." *Larrimore*, 987 A.2d at 738 (quotation marks and citation omitted); *see also Motorists Ins. Cos. v. Emig*, 444 Pa.Super. 524, 664 A.2d 559, 569 (1995).

4. The reasoning in *Catalini, supra*, is not applicable to the present case. In *Catalini*, an auto policy was issued in January 2002, where the insured selected bodily injury limits of $100,000/$300,000 and sought reduced UIM limits of $15,000/$30,000. *Catalini*, 18 A.3d at 1207. In 2004, the insured elected to decrease the bodily injury limits to $25,000/$50,000 and increase the UIM limits to $25,-

000/$50,000. *Id.* Thereafter, in October 2006, the insured elected to increase the bodily injury liability limits to $100,000/$300,000 and explicitly directed the insurer to keep the rest of the coverage the same. *Id.* at 1208. Following an accident, the insured sought to collect UIM coverage up to the bodily injury limits. *Id.* This Court, utilizing the reasoning in *Blood*, concluded that the insurer was not required to obtain a new election for reduced UIM benefits when he changed the bodily injury coverage. *Id.* at 1211, 1213. This Court reasoned that the insured had elected lower UIM coverage at the inception of the policy and had specifically informed the insurer to leave the UIM coverage the same when he increased the bodily injury limits in 2006. *Id.* at 1211. Here, unlike *Catalini*, the Weilachers never signed a valid request for lower UIM coverage limits or informed State Farm to leave the UIM coverage at a certain level after the UM/UIM coverage was added. Accordingly, we conclude that the *Catalini* reasoning is inapplicable to the facts of this case.

---

2119(a). However, this argument appears to support the proposition that the UIM coverage limits must be equal to the bodily injury limits due to the absence of a written request pursuant to section 1734. *See Smith*, 849 A.2d at 281 (stating that "the insurer may supply lower limits only upon affirmative request by the insured.").

Both the trial court and State Farm rely upon *Salazar v. Allstate Ins. Co.*, 549 Pa. 658, 702 A.2d 1038 (1997), to support their claim. *See* Trial Court Opinion, 4/12/12, at 13; *see also* Brief for Appellee at 16–17.

In *Salazar*, the insured applied for coverage from Allstate, and expressly rejected UM coverage. *Salazar*, 702 A.2d at 1040. Allstate complied with sections 1731 and 1791, but did not comply with section 1791.1, "Disclosure of premium charges and tort options," which requires the insurer to provide specific information concerning minimum coverage requirements and tort options to insureds at the time of a policy renewal. *Salazar*, 702 A.2d at 1040, 1043. After the passengers in the insured's vehicle were injured by an uninsured driver, the insured sought UM benefits, arguing that Allstate's failure to comply with section 1791.1 entitled her to UM benefits. *Salazar*, 702 A.2d at 1040. The Supreme Court held that although the insurer had failed to comply with section 1791.1, such failure did not entitle the insured to a remedy because the Legislature had not expressly provided one. *Salazar*, 702 A.2d at 1044.

We conclude that the reasoning in *Salazar* does not apply to this case, and that a remedy exists. As noted above, sections 1731 and 1734 plainly state that an insurance policy must provide UM/UIM coverage limits that are equal to the bodily injury liability limits unless the insured completes a proper request for reduction of the UM/UIM coverage limits. *See Lar-*

*rimore*, 987 A.2d at 743 (stating that "[ ]if there is not proper written request for lower limits in conformity with § 1734, then the UM and UIM coverages are deemed equal to the bodily injury liability limits."). Here, the Weilachers did not request any reduction of the UM/UIM coverage limits after the UM/UIM coverage was added to their policy. Thus, the UIM coverage limit must be equal to the bodily injury liability limit of $500,000.[5] *See id.* (rejecting the insurer's claim that there was no remedy for reforming the UM/UIM coverage limits so that they are equal to the bodily injury liability coverage under the reasoning of *Salazar* because there was no written request for lower limits pursuant to section 1734); *see also Cebula v. Royal & SunAlliance Ins. Co.*, 158 F.Supp.2d 455, 462 (M.D.Pa.2001) (same).[6]

Based upon the foregoing, we conclude that the trial court erred in granting summary judgment in favor of State Farm and that the policy should include UIM coverage limits at a level equal to the bodily injury coverage limits.

Order reversed. Case remanded with instructions. Jurisdiction relinquished.

---

5. We note that the Weilachers have asserted that the limit of liability of UIM coverage is $500,000, stacked for two vehicles. State Farm only disputes the amount of UIM coverage and does not oppose the stacking for the two vehicles. *See* Trial Court Opinion, 4/12/12, at 2 (stating that State Farm "concedes that the policy also allowed the stacking of the [Weilachers'] two (2) vehicles.").

6. We note that the *Blood* Court cites to *Salazar* for the proposition that there is no available remedy where the insured has provided a valid section 1734 reduction of UM/UIM coverage. *See Blood*, 934 A.2d at 1227. For the reasons stated above related to the absence of a valid section 1734 request for lower UM/UIM coverage limits, we conclude that the reasoning in *Blood* with regard to *Salazar* does not apply to this case.